| í KIRBY, Judge.

STATEMENT OF THE CASE

Defendant, Peter Patout, was charged by bill of information on September 17, 1999 in count one with conspiracy to commit theft of cemetery artifacts valued at five hundred dollars or more, a violation of La. R.S. 14:(26)67, and in counts two through seven with illegal possession of stolen cemetery artifacts valued at five hundred dollars or more, all violations of La. R.S. 14:69. Defendant was jointly indicted with six co-defendants, Aaron Jara-bica, Dr. Roy Boucvalt, Carl Campo, Warren Angelo, David Dominici and Jamie Donaldson. However, only one co-defendant, Dominici, was jointly charged with defendant, and that was on the single count of conspiracy to commit theft of cemetery artifacts. Defendant pleaded not guilty at his September 24, 1999 arraignment.
Defendants Campo, Angelo, Dominici, and Donaldson pleaded guilty to various charges. The trial court denied defendant’s motion to quash and motion to sever on February 18, 2000. Following several *704 hearings, the trial court denied defendant’s motions to suppress on March 17, 2000. On May 30, 2000, at the | {¡conclusion of a six-day trial, the six-member jury found defendant guilty as charged on count one, conspiracy to commit theft, guilty as charged on counts three and four, illegal possession of stolen cemetery artifacts, and not guilty on counts two, five, six and seven.[1] On September 1, 2000, the trial court denied defendant’s motions for post-verdict judgment of acquittal, arrest of judgment and new trial, and sentenced him to five years at hard labor as to count one, six years at hard labor as to count three and six years at hard labor as to count four, all sentences to run concurrently. On September 11, 2000, the trial court denied defendant’s motions to reconsider sentence and for appeal bond, and granted defendant’s motion for appeal. On September 12, 2000, this court denied defendant’s writ application as to the trial court’s denial of defendant’s motion for release on bond pending appeal.[2]
For the reasons below we reverse defendant’s conviction and sentence and remand for further proceedings consistent with the views expressed herein.

FACTS

We recount the facts in some detail from the trial testimony because of the bearing it has on the conspiracy charge and the misjoinder of offenses issue.
Ms. Lucille Prima testified that her family ancestors built a tomb in Lakelawn Cemetery in 1912, adorning it with what she characterized as three marble “angels.” On Christmas Day 1997, she discovered that one of the statues Lwas missing, and reported it to cemetery personnel. A second statue was discovered missing on March 6, 1998, after which she reported the apparent thefts to police. She also noticed that a statue was missing from the tomb next to hers, and contacted a family member about it. Ms. Prima identified S 3, a statue of a Lady with a Cross, as the statue stolen from her family tomb between Christmas Day 1997 and March 6, 1998.
Gail Giglio Larocca testified that her family owned a tomb in Lakelawn Cemetery that had been adorned with two urns and statuary, including a statue of Mary. Mrs. Larocca’s brother, Louis Giglio, discovered the statue missing on February 19,1998.
Judy Fury testified that her family owned a tomb in Lakelawn Cemetery adorned with an angel and four urns, two very large ones and two medium-sized ones. She noticed the urns were missing sometime in 1996. She identified photographs of the tomb, pointing out the spaces where the urns had been, and said a photograph in a book depicted the tomb as it looked with all four urns present. Ms. Fury identified the larger urns in court.
Rose Sturgeon testified that she had a family tomb in Greenwood Cemetery. She identified a twenty-five year old photograph of the tomb, depicting a bench in front of it. The bench was removed. She identified the bench in court.
Robert Beckman, director of Operations for Metairie Cemetery, testified that in late 1997 or early 1998, he began receiving reports of items missing from cemetery properties. Over the course of several days, he noticed a suspicious |4white van occupied by two males in the cemetery. *705 He recorded the license plate number. On one occasion he saw the driver in the van, and two males moving some urns. Mr. Beckman identified a number of photographs of tombs in the cemetery.
Bernard Waldman testified that his family owned a tomb in Hope Mausoleum. He identified a photograph taken in 1915, depicting two wrought iron benches situated on either side of the tomb. He said the benches were no longer there. William Wilson testified that the two iron benches referred to by Mr. Waldman used to be in Hope Mausoleum.
James Lebreton testified that his wife’s family tomb was in Lakelawn Cemetery. After hearing of cemetery thefts, he and his wife checked on the tomb and found two wire chairs missing. They identified them after they were recovered by police. He identified the chairs in court.
New Orleans Police Detective Eric Morton testified that Robert Beckman gave him the license number of the white van, which was registered to Mildred Campo. Detective Morton focused his investigation on Carl Campo, a resident at the same address as the owner of the van, and Warren Angelo and David Dominiei, two names given to him by the St. Bernard parish Sheriffs Office. Detective Morton tracked down a number of cemetery artifacts that had been sold by these men to various antique dealers, including defendant and his two co-defendants, Aaron Jar-abica and Dr. Roy Boucvalt.
I When Detective Morton went to defendant’s Royal Street antique store, he was not there. Detective Morton said he could see six urns, two benches and a small Mary statue. Defendant, contacted at his residence by telephone, reluctantly came to the store with an attorney after being advised that a search warrant would be obtained if he declined. Defendant denied that the items were cemetery artifacts, insisting that he had purchased them from a European auction in France. At that point the attorney accompanying defendant called defendant aside. The two had a discussion and, after what Detective Morton said was five minutes, defendant walked back over and said he might have bought two chairs and a Mary statue from David Dominiei. Detective Morton identified two large urns and two chairs that came from defendant’s store.
Detective Morton said he and his partner then asked defendant if he had anything else, but defendant cut them off, saying he had not bought anything else. Detective Morton said they specifically told defendant they had information he may have purchased some larger statues that might be at his residence, and defendant said he did not. The attorney called defendant back to the front door where, according to Detective Morton, there appeared to be a little bit of an argument. Defendant subsequently told the detective that he might have purchased two large statues from Dominiei, and they were at this residence. Detective Morton testified that a statue of the Virgin Mary and statues of our Lady of Prompt Succor and Lady with a Wreath were noted at defendant’s home, as well as four other urns. Detective Morton said police subsequently recovered numerous 1 ^artifacts from other locations throughout the city, both residences and businesses. Defendant was arrested four times during November and December 1998 in connection with his possession of stolen artifacts.
Detective Morton confirmed on cross examination that David Dominiei claimed that defendant and other antique dealers said they wanted detail, like a statue holding a staff or some flowers, that Dominiei said “they” knew it was coming out of the cemetery, and that Dominiei said “they” were all in “cahoots.” He conceded that *706 while in defendant’s store defendant did say something about Atlanta, but maintained that defendant also said something about a European auction.
The detective also conceded that defendant said David Dominici had told him the items came from Millie DeBlanc Plantation. Detective Morton confirmed that Dominici had told other antique dealers the DeBlanc Plantation story, and that he had written in his report as to one of the other dealers that the origin of the items was the Millie DeBlanc Plantation, supposedly an antebellum plantation home located in LaPlace, Louisiana.
Detective Morton admitted he later seized the small statue of the Virgin Mary from defendant’s home, even though defendant protested that he had purchased it at a New Orleans auction. On redirect examination, Detective Morton said that although defendant told him David Domin-ici had told him the items came from the DeBlanc Plantation, defendant never mentioned that he knew Dominici had been lying to him and that there was no De-Blanc Plantation.
LSidney Torres testified that he purchased the statue of the Lady with a Cross from defendant on January 23, 1998, for $700.00 plus tax. He identified it in court. Mr. Torres identified a receipt describing its origin or “provenance” as being the DeBlanc Plantation. He contacted police after seeing a newspaper article in early November 1998 about the cemetery thefts. Detective Green did not call him back until November 25,1998. Defendant also called him that same date and left a message. When Mr. Torres returned the call, defendant asked if he had purchased a statue of a lady holding a cross, and specifically asked which hand the cross was in. Defendant subsequently told Mr. Torres that he was inquiring because it had been brought to his attention that the statue had been stolen. Mr. Torres identified a letter written to him by defendant, dated December 7, 1998, in which defendant apologized. Defendant also enclosed a check for $700.00. Mr. Torres said he had placed the statue in his garden, which also had cement benches in it.
Warren Angelo testified that he had met defendant, and knew co-defendants Aaron Jarabica and Dr. Roy Boucvalt. He admitted that he was testifying in accordance with a plea agreement by which he was pleading guilty to two counts of conspiracy to commit theft of cemetery artifacts, and three counts of theft of cemetery artifacts, and by which he would be charged as a second-felony habitual offender instead of a fourth offender. He admitted to five prior felony convictions.
David Dominici and Carl Campo, whom Angelo knew, once gave him a ride from Canal Street and City Park Avenue. Dominici and Campo had two urns in 1 stheir van, which he helped them deliver to defendant’s home. That was his only contact with defendant.
Carl Campo testified that he had no prior felony convictions and had no plea agreement with the State, although he had pleaded guilty to stealing cemetery artifacts. Campo said he first met defendant in 1997 or 1998. He met Mr. Jarabica and Dr. Boucvalt in 1997. Campo had known Warren Angelo and David Dominici for a long time, and had helped them steal cemetery artifacts. He knew Jamie Donaldson, Dominici’s girlfriend. Campo said he sold things to Dr. Boucvalt fifteen to twenty times, Mr. Jarabica twenty times, maybe more. He did not say how many times he sold to defendant, but said he used to sell him statues. He specifically recalled defendant telling David Dominici one day that he wanted a large angel. Campo said he, Dominici and Jamie Donaldson went to the cemetery and stole the *707 statue of the Lady with a Wreath and delivered it to defendant’s residence the same day. Campo said defendant would tell Dominici “pretty much” what he wanted, Dominici would call him and they would go steal it. Campo specifically recalled delivering some urns to defendant’s residence after February 1998. He said Warren Angelo was present when the urns were delivered. Campo was asked if he saw the urns in the courtroom, and he said he “would have to say” the ones closest to the judge.
Campo confirmed that Dominici made up the story about the DeBlanc Plantation. He said Dominici told that story in the beginning, but that he never heard him tell it to defendant. Campo conceded on cross examination that he had |9pleaded guilty and received two years at hard labor, suspended, with three years probation, with the condition that he serve sixty days in parish prison.
David Dominici testified that he had entered into a plea agreement with the State whereby he would testify for the State, and in return the State would permit him to plead guilty to conspiracy and theft counts and be charged as a second-felony habitual offender, instead of as a fourth offender, and receive a five-year sentence. Dominici admitted to four felony and one misdemeanor convictions. He knew defendant and Aaron Jarabica, and also knew Dr. Roy Boucvalt, though not as well.
When asked by the prosecutor if there was any reason why he was having problems remembering things, Dominici said he, Angelo, Campo and Jamie Donaldson were using heroin on a daily basis, indicating the period when they were stealing and selling these items. Dominici said he sold defendant chairs, benches and about five or six statues. However, on cross examination he conceded that he only thought it had been more than three statues. Dominici specifically mentioned only three, the ones he identified at trial. He identified the statue of the Lady with a Wreath, and said he and Carl Campo stole that one and delivered it to defendant’s home. Dominici also identified the statues of the Lady with a Cross and Our Lady of Prompt Succor (also referred to as the Lady with a Crown), which he said he had also sold to defendant.
Dominici said that as time went on he knew what “they” were looking for, referring to the antique dealers, including defendant. He said that as time went on, lm“they” wanted stuff that had more detail, like statues holding things away from the body. When asked if he knew these things when he first started stealing the cemetery artifacts, Dominici said not really. He said defendant told him that he wanted to get away from religious things, as long as it was old and detailed. Defendant allegedly told Dominici that if he saw something that was interesting, to go ahead and get it. Dominici admitted telling defendant at first that the items he was selling him came from the DeBlanc Plantation. When asked whether defendant ever questioned the story, Dominici said not really.
He testified that as time went on it was obvious where he and his fellow drug-addict thieves were getting things because they had so many of them. He noted that he had needle marks on his arms and questioned whether he looked like the type of person who had $50,000.00 statues on his front lawn. He further stated that defendant would tell him that if he saw something, what Dominici said was “referring to the cemetery,” to be careful. Dom-inici admitted stealing urns, what he called “pot plants.” However, he could not remember selling any urns to defendant.
Dominici admitted on cross examination that he recalled one time he delivered a *708 statue to defendant and there was a lady present, and conceded that he may have talked to her about the Millie DeBlanc Plantation. Dominici said a drug-world friend of his, Timmie Fossier, was with him when he delivered things, perhaps on two occasions. He said he believed that on one occasion when he and Fossier delivered a statue, defendant wanted a receipt and some information. He |, identified a piece of paper with his mother’s telephone number and his name on it. He identified his handwriting on the piece of paper, which also had DeBlanc Plantation, La-Place written on it, a purported address in Pass Christian, Mississippi, and the name Millie DeBlanc. The piece of paper also had the name Timmie Fossier on it, an address in St. Bernard, and what Dominici indicated was Timmie Fossier’s social security number. Dominici confirmed that he wrote these things down. Asked about what appeared to be another social security number, defendant said he assumed it was a fake number he had written down. There was also an address and a telephone number, neither of which he recognized.
Dominici admitted that he was arrested and jailed on a heroin charge on April 4, 1998. He said he could not remember when he stopped selling things to defendant, but said he pretty much continued to do so until he went to jail. Dominici said he did not remember defendant chasing him away from his antique store.
Dr. Jack Holden, Baton Rouge pathologist, testified on behalf of defendant. He had known defendant for several years, after meeting him through mutual friends. Dr. Holden said he was a collector of antiques, had dealt with defendant, and he had entrusted defendant to purchase items for him. He said he was aware of defendant’s reputation, which was a good reputation of fair priced quality items. Dr. Holden confirmed on cross-examination that defendant’s antique store specialized in furnishing that would come from a plantation, and that defendant held himself out as an expert in Louisiana plantations, Louisiana furniture, and |12decorative items, which includes statues. However, Dr. Holden added that he and his wife were not particularly interested in the statues or the 19th Century that the statues came from, so he really could not say much about defendant’s knowledge in that area.
Donald Anthony Rodrigue, an investigator with Orleans Parish District Attorney’s Office, testified that it took him five or six telephone calls and fifteen to twenty minutes to ascertain that no DeBlanc Plantation existed. He spoke with the manager of the Destrehan Plantation, who advised him that as far as she knew it did not exist. He contacted the Louisiana Historical Society, where someone told him that as far as she knew it did not exist. He contacted dispatchers at the sheriffs departments for St. James and St. Charles Parishes, who advised him that they had no DeBlanc Plantation as a location to be dispatched for the police department. He did not look for residents named DeBlanc, or check a map of all the plantations along the Mississippi River.
Jamie Donaldson identified a copy of a plea bargain agreement with her signature on it. She admitted a prior felony conviction for possession of cocaine. She said she knew defendant and his two codefend-ants, and identified each by name. She said defendant owned an antique store in the French Quarter and “we” used to sell him statues, urns, benches and chairs. Donaldson said they sold defendant seven or eight statues. She claimed defendant asked them several times if the items were stolen, said they looked stolen, and asked them to provide written proof that they were not, which she said they were unable to do. She recalled | ^stealing the large *709 statue in evidence, and said they sold it to defendant. They went to his store and were instructed to take it to his residence, where they put it in the courtyard. She said they went to defendant’s store at least once or twice a week.
Donaldson admitted on cross examination that she pleaded guilty to seven counts of theft, and was facing a maximum of seventy years in prison. She received two years on each count, to run concurrently. She admitted to pleading guilty to stealing the three lady statues, with the crown, the wreath and the cross. She was present when Dominici sold the statue of the Lady with a Cross to the defendant. She was also present when Dominici sold the large statute of the Lady with a Wreath to defendant, and recalled a woman being there. She said Dominici told the fictitious story of the DeBlanc Plantation to many antique dealers. She did not specifically recall Dominici telling the plantation story to the woman who was present at defendant’s store that day. She said that story was told toward the beginning of the thefts. On the day Dominici sold the statue of Our Lady of Prompt Succor (the Lady with a Crown) to defendant, Timmie Fossier, a Mend of Dominici, was present.
New Orleans Police Detective Lawrence Green accompanied Detective Morton to defendant’s store. He confirmed Detective Morton’s testimony that defendant was contacted at his residence by telephone and asked to come to his store, and he came with an attorney. The detectives advised defendant they were investigating cemetery thefts. Defendant said he had purchased some items the detectives were interested in at an auction in France. Defendant was advised that[uthe officers had made arrests, and that suspects had advised them that they had sold stolen cemetery artifacts to him. At that point, defendant’s demeanor changed. He consulted with the attorney for a few minutes, and then admitted purchasing three marble urns, two wire chairs and a small statue from Dominici. He said that was all he had purchased from Dominici, and that he had never sold anything he purchased from Dominici. The detectives asked him if he was certain, and advised him that if he was found in possession of anything else he could be prosecuted. Defendant stepped outside with the attorney, and they “argued” for four to five minutes. Defendant returned inside and admitted he had more items at his home.
At defendant’s home the detectives found a large statue of the Lady With a Wreath and the statue of Our Lady of Prompt Succor. Detective Green said defendant told the detectives at his home that Dominici said the two statues came from the DeBlanc Plantation. Detective Green conceded that many other antique dealers related that Dominici told them the same thing about the items he sold to them. Detective Green said defendant told them that a small statue inside of his residence was legitimate. That statue was introduced in evidence. Detective Green said he and Detective Morton noticed two small urns in defendant’s courtyard, but did not seize them at that time. Those urns were seized by police seven months later, in November 1998, from the same location in defendant’s courtyard they had been in April 1998. Detective Green admitted that defendant’s attorney had written a letter to him listing several items remaining in defendant’s possession that he had purchased from Dominici. Detective Green said those items [1Bwere later turned over to the police. The detective also said that defendant was not arrested in connection with those items.
William Brown, a personal property appraiser, was qualified by the court as an *710 expert in the appraisal of objects, including but not limited to cemetery artifacts and/or religious artifacts. He appraised thirteen items at Lakelawn Cemetery, including the three statues defendant purchased from Dominici. Mr. Brown appraised S-7, the statue of Our Lady of Prompt Succor, 48 and ^ inches tall, at $6,000.00, and said this statue would have been worth more had some fingertips and crown tips not been broken off. He appraised S-3, a 52 inch tall statue of the Lady with a Cross at $6,500.00, and S-49, a life-sized statue of a Lady with a Wreath at $24,000.00. He also appraised the following: S-40, a 40 inch tall statue of the Virgin Mary, at $4,500.00; S-41, a 42 inch tall statue of the Sacred Heart figure of Christ, at $5,500.00; S-32, a wrought-cast iron double bench, at $2,500.00; S-15, a double settee, at $800.00; S-33 and S-34, antique wire chairs, at $350.00 each; S-12, a marble urn, at $3,000.00; S-ll, a marble urn, at $3,000.00; S-50, a marble urn, at $3,200.00; and S-51, another marble urn, at $4,000.00.
Lewis Jones, owner of a Magazine Street antique store, testified on behalf of Aaron Jarabica. He said when he purchases items from people off the street, he has them fill out a “vendor’s affidavit.” He said they have to have photo identification. Mr. Jones purchased four statues from David Dominici, who told him that they came from a relative’s estate in La-Place. He said he accepted Dominici’s story, and said he would not have purchased the items if he had doubts |1fiabout the story. Mr. Jones said his business was not related to cemetery art, but specialized in collectibles, such as toy fire trucks from the 1950’s.
Chet Pourciau, the manager of the Pottery Barn in Canal Place, testified that he previously had worked in defendant’s antique store, and had also worked in two other antique stores. He said defendant sold Louisiana antiques. Mr. Pourciau said he had seen defendant at a large antique warehouse-type marketplace in Atlanta, Georgia. He also said that it was a common practice for people to sell to antique dealers. He said that when he worked for defendant, people would come in and sell things, but that defendant would deal with those people. However, he said he never actually saw defendant buy anything from these people. When asked if buying things off the street was something defendant did, Mr. Pourciau answered in the negative.
Father Rivers Patout, a priest from Houston, Texas, was defendant’s cousin. He said he had known defendant for thirty-three years, would see him at least once a year, sometimes more, and knew his reputation for honesty, truthfulness and integrity. He said he had never heard anything about defendant being dishonest.
Stephen Harrison, curator in charge of decorative arts at the Dallas Museum of Art, had also worked as a curator at the Cabildo in New Orleans. He met defendant in the summer of 1993 when he was working on his master’s thesis, the subject of which was the 19th century furniture trade in New Orleans. Defendant was recommended by a museum as a source of information on Louisiana furniture and collectors, and where pieces might be located in New Orleans.
117Mr. Harrison identified an 1857 New Orleans court document relating to the bankruptcy of Prudent Millard, whom Mr. Harrison confirmed was the most famous and fashionable furniture dealer in 19th century New Orleans. Listed as one of Prudent Millard’s debtors was a Chaz De-Blanc. Mr. Harrison found the document during his research and took it to defendant for explanation. Mr. Harrison also said the document contained the names of *711 some of the oldest Louisiana families, including one who owned the largest plantation on the River Road, one who owned the largest residence on the River Road, and someone from Rosedown Plantation.
Mr. Harrison testified that he came to New Orleans from Dallas four to five times a year. He knew others who knew defendant. He said defendant always had the highest reputation of any antique dealer that he knew of, including those in New York, Boston, London and New Orleans. He had never heard of any negative things about defendant’s business practices or his character. Mr. Harrison conceded on cross examination that he sought out defendant because defendant could provide him with specialized knowledge on the 19th century Louisiana furniture trade. He said defendant had a reputation among his peers as being very knowledgeable in the area of antiques, as someone in the antique world who knows what he is doing, and as a good businessman.
Michael Hopping, a licensed landscape designer, testified on behalf of defendant. He was qualified as an expert in the area of garden design. He testified that Louisiana plantations had gardens containing ornamental statuary. He also l1ssaid that there are in commerce such ornamentation from plantations that have gone into decay. He stated that cast iron and wire furniture was found in gardens, noting the custom was quite prevalent and still in existence. Mr. Hopping said that Louisiana plantation gardens also contained classical statues and urns, as well as religious statues or statues with religious themes, and that existing gardens still contain such items. He referred to slides of statues shown at several well-known Louisiana plantations. One was a lady holding a wreath. Another was a statue of Our Lady of Prompt Succor. Mr. Hopping also testified that these types of statues are found in gardens of average citizens, citing the many statues of the Blessed Virgin one can see in New Orleans neighborhoods. Mr. Hopping noted that since Vatican II, the Catholic religion has been de-emphasizing icons. Mr. Hopping said that private plantation cemeteries also contained statuary, some of which had entered the stream of commerce. He mentioned the Girard Cemetery, which formerly stood near the site of the present Louisiana Superdome, and showed a slide of a marble statue of a lady in that cemetery, which he said was de-consecrated in 1957.
Mr. Hopping cited examples of non-religious statuary. He also showed slides of marble statuary, urns, wire and cast iron benches from various auction catalogs, including Sotheby’s, what he characterized as the premier auction house in the world. Finally, Mr. Hopping showed a number of slides of these types of items for sale at local and out-of-state locations-antique stores, a Nashville garden and antique show, etc. Mr. Hopping viewed all of the stolen property introduced in [^evidence, and confirmed that they “very definitely” were items that one might find in a Louisiana garden. Mr. Hoping said on cross examination that the marble statues were fragile and it was very important to handle them carefully.
Charles Rosato testified that he was a thesis short of a master’s degree in geology and paleontology. He had owned an auction house since 1970, and was a licensed auctioneer in Louisiana. He was qualified as an expert in the field of auc-tioneering and appraisal. Mr. Rosato appraised the same stolen cemetery artifacts previously appraised by the State’s appraiser, William Brown. Mr. Rosato appraised all of the items at less than the appraised value put on them by Mr. Brown, including the two statues defendant was convicted of possessing, the stat *712 ues of the Lady with a Cross and the Lady with a Wreath. Mr. Rosato appraised the statue of the Lady with a Cross, S-3, at $3,000.00-$4,000.00, while Mr. Brown had put it at $6,500.00. Mr. Rosato appraised the statue of the Lady with a Wreath at $5,000.00-$8,000.00. Similarly, Mr. Rosato appraised the statue of Lour Lady of Prompt Succor at $3,000.00-$4,000.00; S-"40, the statue of the Virgin Mary at $2,500.00-$3,000.00; and S-41, the statute of the Sacred Heart figure of Christ, at $2,500.00-$3,000.00, all less than the figures given by Mr. Brown. All but two items were valued at over $500.00; Mr. Rosato valued S-33 and S-34, two wire chairs, at $300.00-$400.00 each, Mr. Brown, $350.00 each.
Mr. Rosato answered in the negative when asked if there was a retail price for antiques, and said that if he would go to an auction he would pay $600.00-$900.00 for one of the two marble urns in evidence and that he had just appraised 1 ^at $1,200.00-$1,800.00. Mr. Rosato identified an auction list from a December 1995 auction at this business, Hampshire House Auctions, where defendant purchased statues of the Blessed Virgin and the Sacred Heart of Jesus, for $35.00 and $50.00 respectively. Mr. Rosato agreed with the notice that a sale from an individual to a dealer would not necessarily be as high a price to the individual seller as would a sale at an auction. When asked whether the sale price might even be lower if an individual walking into an antique store needed money, Mr. Rosato replied that it was a good possibility.
Mr. Rosato admitted on cross examination that he knew defendant, and that defendant helped him measure things in storage containers at the cemetery during his appraisal process. Mr. Rosato said he did not know whether he actually consulted defendant on values, but conceded that he might have asked his opinion. However, he denied that defendant helped formulate the prices he listed in his report. He then conceded it was possible that he referred to Mr. Brown’s appraisal report continuously throughout his own appraisal procedure, and consulted with defendant as he did so.
Mr. Rosato admitted that if someone offered to sell him the statue of the Lady with a Wreath for $400.00, which he had appraised at $5,000.00-$8,000.00, that would be a “really good deal.” Mr. Rosato said that if someone offered to sell him that statue for $400.00 out of the back of a car he would be “very curious.” However, while he said he keeps a record of what people sell him, he does not verify information given by the seller as to the origin of items given to him to sell l^at his auction. Mr. Rosato acknowledged that antique dealers typically will mark up pieces between 100-150%, but also noted, for example, that an art collector will purchase a painting for $35,000.00 and send it to Sotheby’s, where it will bring $500,000.00. He said that is the nature of the business. As to an individual sale which might arouse his curiosity, he was asked whether his curiosity would be satisfied if he obtained the full name of the seller, driver’s license number, social security number, license plate number and signed receipt, and Mr. Rosato replied that he absolutely would, noting that he would then have recourse.
Kevin Beer, a Los Angeles, California antique dealer and interior designer, testified on behalf of defendant Peter Patout. Mr. Beer came to New Orleans in October 1995 for a Halloween party. He identified a photograph of himself and a friend taken in defendant’s courtyard on Halloween 1995, and confirmed that he saw an urn in the photo. When asked if he saw that urn in the courtroom, Mr. Beer pointed to S- *713 51, and when asked if he was sure, he replied in the affirmative.
Julie Reed, a journalist and resident of New Orleans and New York, had known defendant for approximately seven years, and considered him a friend. She wrote an article on defendant for the April 1996 issue of “World of Interior,” a renowned interior magazine. A number of photographs accompanied the article, including some of defendant’s patio. One of these depicted an urn in the patio. An unpublished photograph taken at the same time, early December 1995, showed another urn. Ms. Reed, who lived down the street from defendant, said she had | ^visited defendant’s residence dozens of times since the article was done, and she said the urns were there for years after the photos were taken.
Aleda Long worked for defendant at his antique store from late summer 1997 until February 1998. During the time she worked there people would come in seeking to sell things to defendant. She recalled David Dominici coming to defendant’s store at least three times during the period she worked there. On the first occasion, Dominici was helping defendant bring in some wire furniture during normal business hours. On the second occasion, Dominici asked for defendant, but quickly left when he learned defendant was not there. The third time, Dominici was very anxious to sell something, but defendant was not there. He was very insistent, and she went outside to view an item in a white van, really intending to get him out of the store, as she had no intention of purchasing anything from him. It appeared to be an old 1940’s telephone table that seemed to have been in a fire. She declined to purchase it, and Dominici left.
Ms. Long identified one of defendant’s business cards, on which she had written “19th century statue of Lady with a Cross from DeBlanc Plantation,” with a price next to it. She had given the card to Sidney Torres and his wife, and the information she had written on it was what had been written on the tag that had been placed on the statue. Ms. Long viewed the statue of the Lady with a Cross that had been introduced in evidence, and said it appeared to be the same statue. When asked whether she typically saw defendant purchasing from persons off thej^street, Ms. Long replied in the negative. However, she also said that weeks often passed without her seeing defendant, as her schedule varied.
Blanche Lovelly testified that she met defendant in the fall of 1998, and the two had since been friends. Ms. Lovelly characterized herself as a historian. She was first introduced to defendant when she and a friend were on their way to a meeting of the St. James Historical Society in St. James Parish and the friend offered a ride to defendant, who had been stranded on St. Charles Avenue after a streetcar had broken down.
Ms. Lovelly identified a page from her calendar reflecting a lunch engagement with defendant on January 28, 1998.[3] The *714 purpose of the luncheon was the discussion of an upcoming private tour of defendant’s home by five groups from the National Trust. On the day of the tour, an individual arrived at defendant’s Bourbon Street residence in the late afternoon with a statue. Defendant asked Ms. Lovelly, who said she was preparing to leave, to stay and see what the statue looked like. She saw a white van with a statue partially sticking out of the window. Ms. Lovelly asked the man where he had obtained the statue, and he responded by asking her if she knew the DeBlanc family. She said she had heard of them, and the man asked her if she knew where the DeBlanc Plantation was located. She said she did not, and the man told her it was in LaPlace. He gave l^her directions to it, i.e., when you get off a certain highway, turn, go two blocks and take a left, etc. Ms. Lovelly said the directions were very specific. The man described a house here, a gas station there, etc. Defendant had come outside by then. The man said there was an elderly lady there who was going into a nursing home and she was selling the statue. Defendant asked the man the name of the nursing home, and the man said he had forgotten, but had it written down somewhere. Defendant said that he would buy the statue. Ms. Lovelly said that defendant told the man that if he found out that the statue was stolen, he was going to turn him in.
Ms. Lovelly said on cross examination that the statue was lying across the middle seat, and part of the base was sticking out of a window. She said it crossed her mind that the man could have protected the statue a little better. Ms. Lovelly said she had no reason to believe that the man did not have title to the statue. She said she would not have expected the man to have “papers” on the statue, stating that one does not go into an antique store and expect people to have “papers.” She elaborated on the way in which the man gave directions to the supposed DeBlanc Plantation, stating that he said it in a rapid manner as if he knew exactly where it was and what he was talking about. Ms. Lov-elly posited that he might have been a “picker,” one who finds things and offers them for sale to antique dealers, stating that no one has “papers” on these types of objects. Ms. Lovelly admitted that she had never heard of a DeBlanc Plantation, but said the DeBlancs could have had a plantation.
| ¡«Leslie Barbee Ponder, an in-house attorney for Bell South, testified that he met defendant in late 1991, and that he considered him to be a friend. He had been in defendant’s home, including his courtyard. He had seen a pair of urns in the courtyard that had been there for as long as he could remember knowing defendant. He said he had probably given defendant legal advice about different matters over the years, but had never represented him as a lawyer, and had never, sent him a bill for legal services. On April 14, 1998, defendant telephoned him and asked him to meet him at his store because some police officers wanted to go through it. At that time Mr. Ponder and his wife were living on Chartres Street, around the corner from defendant’s store. He met defendant on the street and accompanied him to the store. The officers asked whether Mr. Ponder was defendant’s attorney, and Mr. Ponder said he replied that he was an attorney, but was not representing defendant and was not there to be his attorney. Mr. Ponder said the officers explained that they were going to various antique stores trying to recover items believed to have been stolen from cemeteries, and said that *715 if the storeowner cooperated, there would be no problems. Mr. Ponder said defendant agreed to cooperate.
The detectives asked defendant if he knew David Dominici, and defendant said he did. Defendant picked out a photograph of a person from a group of photos laid out by the officers. When asked whether defendant ever denied having purchased anything from Dominici, Mr. Ponder replied, “No. Absolutely not.” To the contrary, he said, defendant replied “Yes” when asked that question by the | {.¿officers. Mr. Ponder said when the officers asked defendant to point out what in the store he had purchased from Dominici, defendant pointed out items for them. He said defendant never told the officers anything about purchasing any of the items from France. Rather, he said that when the officers asked about some urns on the floor, defendant said he had gotten them in Atlanta, or that they came from Atlanta. They asked for a receipt, and defendant replied that he probably had one, but that it would take a while to find it. One officer said he would have to take those with them. They asked defendant whether he had sold any of the items he had obtained from Dominici, and he said that he had. They asked him to get them back from those customers if he could, and defendant agreed to do that. Right after discussion of the urns, the officers asked defendant about his home. They asked if they could go through his home, and defendant said no. Mr. Ponder said at that point he asked defendant to step outside. He advised defendant that he believed the officers just wanted him to cooperate. He advised defendant that everything would be all right if he just cooperated, showed them through his home, and pointed out any other items he might have gotten from Dominici. Mr. Ponder denied that this conversation between him and defendant was heated, saying it could not have been less heated, and that it took about one minute. The only thing defendant said to him was okay.
Before leaving for defendant’s residence, defendant asked the officers for a receipt for the items they were taking from the store. Mr. Ponder said at defendant’s residence officers seized two statues from the courtyard. He identified l^those statues as the ones marked S-49 and S-7, the Lady with a Wreath and the statue of Our Lady of Prompt Succor. Mr. Ponder thought defendant told the officers the statues came from the DeBlanc Plantation. The police said that in order for them to be able to say they had done their job they needed to go through the whole house. He said defendant opened the door and said have at it. Mr. Ponder recalled a long conversation about a particular statue that defendant said he had purchased at an auction of items from the Catholic Daughters. Defendant denied to the officers that two urns came from Dominici, and Mr. Ponder said he personally advised the officers that the urns had been there a number of years, before any of this started. Mr. Ponder testified that several weeks or a couple of months before that day he had seen David Dominici. Mr. Ponder said he was in defendant’s shop, and a person was hanging around outside as defendant was attempting to deal with customers. After finishing with one customer, defendant turned around, opened the door, and told the man he never wanted to see him again, to get away from his store. Mr. Ponder said he thought that “extremely out of character” for defendant. He later came to the realization that the man had been David Dominici.
Mr. Ponder said he was sure he was with defendant the whole time they were in the store with the police officers on April 14, 1998. He said that when police asked defendant where Dominici told him *716 the items came from, defendant said the DeBlanc or Millie DeBlanc Plantation in LaPlace.
| ^Defendant Peter Patout testified that he opened his first antique store in 1988, and moved to his Royal Street location about five years later. He described, with the aide of a plot of his Bourbon Street property, where the statue of the Lady with a Wreath and the statue of Our Lady of Prompt Succor were located in his courtyard. He also said a statue of Mary was located in the guest apartment in front of the fireplace.
Defendant said he purchased antiques from various sources, local auctions, auctions in New York and flea markets in Texas, and that once a month he traveled to a huge flea market in Atlanta, Georgia. He also said he bought from local “pickers.” Defendant said he had not bought from France. He stated that he purchased an urn introduced in evidence, S-51, from Jennifer Ireland at the Atlanta flea market, paying cash for it. Ms. Ireland told him it came from a garden in St. Louis, Missouri. Defendant identified a cancelled check for $1,000.00 he wrote to Ms. Ireland on July 27, 1995, for a cast iron bench. Defendant identified a check for $1,000.00 he said he wrote to Ms. Ireland in 1995 in payment for the two large urns introduced in evidence, S-ll and S-12. He identified a handwritten receipt along with the check indicating that he purchased large urns from Ms. Ireland. Defendant said the photograph of Kevin Beer at a Halloween party at his home showed one of the two smaller urns. He identified a photograph taken in connection with the feature article on his home in “Interior World” magazine, written by Julia Reed, and said the urn in the photo had a drain hole with a small triangular chip in the rim that was almost in line with the drain hole. He said it | ?,9also had an unusual rectangular rim. Defendant said that urn with those distinctive features was in court. Defendant testified that the two smaller urns in evidence were purchased from Jennifer Ireland and were in his courtyard in 1994 and 1995, and were there until police took them in November 1998. Defendant said he never purchased a flower pot or urn from David Dominici. Defendant identified another check, in the amount of $800.00, and a handwritten note representing some urns he purchased from Ms. Ireland. Defendant also testified that he purchased other urns from Ms. Ireland, and that he sometimes paid with cash. He had no other records, however. Defendant described his record-keeping during that time period as antiquated. He said he had no idea that any of the urns he purchased from Ms. Ireland may have been stolen; she told him she got them from around her home, and also Kentucky, Savannah and Charleston.
Defendant recalled that he met David Dominici in the latter part of 1997 at his store. He purchased three cement benches from Dominici at that time. Defendant said, like anybody he bought from whether off the street or at the flea market, he asked from where they came. Dominici told him that somebody in his family worked for the DeBlanc Plantation in LaPlace, that “she” was being moved into a nursing home, and “they” were given these things to sell. Defendant said he recognized the DeBlanc name as a old Louisiana French family who came here in the 18th Century. He asked Dominici for his driver’s license, and Dominici showed it to him.
lanThe next items he purchased from Dominici were two wire chairs, which defendant identified as the ones introduced in evidence as S 33 and S 34. Dominici told him they came from the DeBlanc Plantation. Defendant identified a maga *717 zine containing photographs of his store taken shortly after Christmas 1997, which he said depicted the two wire chairs.
Defendant identified a receipt given to him by police for the items they seized from his store and home in April 1998. Two marble urns, the two wire chairs and statues of the Lady with a Wreath and Our Lady of Prompt Succor were on the list, and all of these items had been introduced in evidence and were in the courtroom. Also on the list were two other marble urns, two draped marble urns and a marble statue of the Virgin Mary. None of these items were in the courtroom. Defendant identified a receipt, handwritten by him, purportedly reflecting that he purchased the two draped marble urns from a Ron Barber for $575.00. Accompanying that receipt was a cancelled check dated May 8,1997.
Defendant said he purchased the marble statue of the Lady With a Cross from Dominici for $650.00. Dominici told him it came from the DeBlanc Plantation, and defendant labeled the statue with that information. Defendant said he was in Atlanta when his employees sold it to Sidney Torres for $700.00 plus tax, after negotiating over the telephone with him. He said he did not think about that statue again until the day before Thanksgiving 1998, when he saw a photograph of a statue in the Times Picayune with an article about it having been stolen. Defendant thought it looked like the statue he had sold Mr. Torres, and he |S1 tracked down Mr. Torres. He informed Mr. Torres that someone was being accused of stealing the statue, and he asked him if it had a cross. He then asked how the lady was holding the cross. He then confirmed that indeed it was the statue in the newspaper, and asked Mr. Torres if his attorney could call him.
Defendant related the story of how he came to purchase the statue of the Lady with a Wreath from Dominici when he was with Blanche Lovelly. He paid Dominici $700.00 for the statue. Defendant said he purchased the last statue, the one of Our Lady of Prompt Succor, from Dominici for about $700.00 also. Dominici rang his doorbell, and again, when defendant asked where it came from, Dominici said it was from the DeBlanc Plantation, volunteering that the elder Ms. DeBlanc had been placed in a nursing home in Pass Christian, Mississippi. Defendant said he asked Dominici to write down the information about where she was. He also asked for Dominici’s telephone number, as well as his driver’s license number and his friend’s driver’s license number. Defendant identified the handwritten note from Dominici given to him at that time. Defendant said that he was impressed by the quality of the pieces, and so, shortly after purchasing the last one, decided to get in touch with Ms. DeBlanc to see if she might have other things to sell. Defendant checked the note Dominici had given him, and realized that the telephone number for the nursing home was incomplete. So he called the telephone number Dominici had written down as his, and discovered that it was not a legitimate number. Defendant said he then realized that something was wrong. He said perhaps a week later he was busy serving customers in his store when he |3g.spied Dominici out in front on his store. He said he eventually went outside and ordered Dominici to get away, that he never wanted to see him again. He said he did not even give Dominici a chance to talk. Defendant said the next time he saw Dominici was in the courtroom in shackles.
Defendant admitted that when Detective Morton and Detective Green telephoned him at his residence on April 14, 1998, he denied having any stolen property in his store. When he asked them if they could come to his store the next day, he said *718 they threatened to obtain a search warrant and break down his door. He said he was very upset and telephoned his friend Bar-bee Ponder to ask if he would accompany him. After defendant opened his store, the detectives asked Mr. Ponder if he was defendant’s attorney, and Mr. Ponder replied that he was an attorney, but not his attorney, that he worked for the telephone company. The detectives explained that they were conducting an investigation into cemetery thefts, and asked if he knew David Dominici. Defendant said he did, and told the detectives that he had purchased the pair of wire chairs from him. He identified defendant’s photo from a lineup. Defendant denied ever telling the detectives that he purchased the furniture from France.
They asked about the urns, and he told them he purchased them from a woman at a flea market in Atlanta. He said the detectives took those urns and some other things he had purchased in Atlanta. Defendant confirmed that he had emphatically denied getting - these particular items from Dominici. The detectives l33asked him if he had sold anything purchased from Dominici, and he told them he sold a wire bench and two chairs.
Defendant conceded that he had a conversation with Barbee Ponder at one point, but denied that it was agitated, and said it lasted eight seconds. Defendant said that the conversation was precipitated by the detectives announcing that they were going to take the urns and a very small statue of Our Lady of Prompt Succor that had not been purchased from Dominici. He admitted that upset him.
They asked if he had anything else purchased from Dominici, informing him that it he cooperated he would not be charged. Defendant admitted that he denied he had anything else, but he did so because he was afraid that if they came to his home they would seize a lot of things he had not purchased from Dominici. That was when Barbee Ponder took him outside and advised him that if he had anything else he should fully cooperate. Defendant said he walked back into the store and advised the detectives he had two statues at his home that he purchased from Dominici. These were the statue of the Lady with a Wreath and the statue of Our Lady of Prompt Succor that had been introduced in evidence. He informed the officers that Dominici had represented to him that the statues were from the DeBlanc Plantation, and had been given to his family in exchange for work they performed for the owner, who was moving into a nursing home. While at his residence the detectives asked if they could walk through it, and he said they could, even offering to let them into the attic. When the detectives asked about a statue of Our Lady of Guadalupe in his guesthouse, he informed them that he had obtained it ls4from a Hampshire House Auction of property belonging to the Catholic Daughters of America. They asked about the two small urns in his courtyard, and he told them he had purchased them from the flea market in Atlanta.
On November 4, 1998, while defendant was attending an antique forum in Natchez, Mississippi, he said he got a telephone call from an assistant, who informed him that there was a warrant for his arrest, and that police had seized the two urns and the statue of Our Lady of Guadalupe from his residence. Defendant hired an attorney and surrendered himself.
Defendant identified a letter dated December 3, 1998, confirming a meeting from the previous day, and advising that defendant still had in his possession three cement benches and three pieces of wire furniture purchased from Dominici. Defendant identified a magazine article about *719 Jennifer Ireland, from whom he purchased urns in Atlanta. Defendant identified four letters he wrote to clients who had bought items from him that he had purchased from Ms. Ireland. He said he recovered all of this property, reimbursed his clients, and turned over the property to police after learning that Ms. Ireland had been arrested in possession of stolen property.
Defendant identified a lawsuit he filed against David Dominici on February 10, 1999, itemizing things he purchased from him. Defendant said he never knowingly purchased stolen items from David Domin-ici or placed an order for something he wanted Dominici to steal from a cemetery.
1 ^Defendant confirmed on cross examination that he was a resident curator at Pitot House, defining a curator as one who takes care of a collection, and that he also had been the administrator of operations at Oaklawn Manor, a plantation home in Franklin, Louisiana. Defendant described Oaklawn as a house museum. Defendant admitted that he was on the advisory board for the historic preservation of Laura Plantation, located on the River road in St. James Parish. Defendant confirmed that he was the decorative arts advisor to the Grevemberg House, also in Franklin. Defendant testified that he sold antiques to the Louisiana State Museum and Her-mann-Grima House, both in New Orleans, the Magnolia Mound Plantation in Baton Rouge, the Destrehan Plantation on the River Road, and to Arlington Plantation, located in Birmingham, Alabama. Defendant admitted that he was extensively knowledgeable on Louisiana plantations.
He characterized David Dominici as the type of person who is referred to as a “picker,” someone who roams the countryside searching out antiques to buy from homeowners and resell to dealers. Defendant conceded that the items Dominici was selling supposedly came from one place, the DeBlanc Plantation, but that he still considered Dominici a type of picker because he drove up and offered to sell items out of a van.
Defendant said he paid Dominici in cash for ap -the things he purchased from him-cement benches, the wire chairs, and j^ie flhoreg statues. Defendant said that ]y[r- Torres came into his store several times to bargain with him for the statue of the Lady with the Cross. He represented to Mr. Torres that the statue was from the |afiDeBlanc Plantation. Defendant estimated that when the detectives came into his store on April 14, 1998, it had been a couple of months since he had purchased anything from David Dominici. Defendant maintained that when one of the detectives told him on the telephone that they believed he had some stolen property at his store, and he responded that he did not, he was not aware that any of the things in his store were stolen.
Defendant admitted that after showing the officers the wire chairs he had purchased from Dominici, he answered “no” when they asked if he had anything else Dominici sold him. He later admitted that he had the two statues at his residence. As for the statue of the Lady with the Cross, defendant said he had forgotten about that statue, never contacted Mr. Torres about it and never mentioned it to police. Defendant noted that he was out of town when that statue was sold.
He said he never asked Dominici where the DeBlanc Plantation was located, but said that he did not have to because his friend Blanche Lovelly asked Dominici, and he was present. Defendant admitted that he did not get anything written down from Dominici until he purchased the last item, the statue of Our Lady of Prompt Succor. Defendant admitted that some of his information Dominici wrote down was false, and that he became suspicious. *720 However, he maintained still that he did not know at that time that the background information Dominici gave him on the pieces he had purchased was false. Defendant admitted that he ordered Dominici to leave and not come back in March 1998, but did [37nothing else. When asked if he kicked Dominici out of his store and told him never to come back because he thought Dominici was selling him “bad stuff,” defendant replied, “Um, yes, I did.” However, he said he did not know that these things were definitely stolen until he was first arrested in November 1998. He explained that even the police seizure of some of the items on April 14, 1998 was not conclusive, as he knew the police had seized items he had not purchased from Dominici. He admitted that he later learned that the Atlanta woman, Jennifer Ireland, from whom he had purchased a number of urns, had been arrested with stolen goods.
Defendant replied in the affirmative when asked on redirect examination whether he thought the matter was concluded after police seized the items from his store and residence in April 1998. He said that was what the police had told him.

ERRORS PATENT

A review of the record reveals no errors patent.

ASSIGNMENTS OF ERROR NOS. 1, 2 & 3

In these related assignments of error, defendant argues that the trial court erred in denying his motion to quash based on misjoinder of parties, in denying his motion to sever, and in denying his motion for new trial on the grounds of the alleged errors in denying the motion to quash and the motion to sever. Joinder of defendants is governed by La.C.Cr.P. art. 494, which states:
IssTwo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
In his motion to quash, filed before the heroin-addict thieves pleaded guilty, defendant sought to be severed from, notably, Aaron Jarabica and Dr. Roy Boucvalt. The objection of misjoinder of defendants properly is, and may only be, urged by a motion to quash. La.C.Cr.P. art. 495.
The source of the joinder of defendants article, La.C.Cr.P. art. 494, is Federal Rule of Criminal Procedure 8(b). The two rules are identical. As such, federal authorities are persuasive. See State v. McZeal, 352 So.2d 592, 604 (La.1977), on rehearing (finding federal practice and procedure treatise persuasive). La.C.Cr.P. art. 495.1 provides that if it appears that a defendant or the state is prejudiced by a joinder of offenses in a bill of information or by joinder for trial together, a court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires. F.R.Cr.P. 14 provides for severance under federal law. The remedies provided for by La.C.Cr.P. art. 495.1 presume properly joined defendants. See Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). (“[Wjhen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if. ....”); United States v. Bermea, 30 F.3d 1539, 1572 (5 Cir.1994) (“If defendants have been properly joined, the district court should grant a severance only if. ....”). The joinder rule embodied in La.C.Cr.P. art. 494 is to be broadly construed in favor *721 of initial joinder. See United States v. Piaget, 915 F.2d 138, 142 (5 Cir.1990) (F.R.Cr.P.8(b) to be broadly construed in favor of initial joinder).
139Joinder of defendants does not require that each defendant have participated in the same act or acts. United States v. Krenning, 93 F.3d 1257, 1266 (5 Cir.1996). All that is required for proper joinder is a series of acts unified by some substantial identity of facts or participants. Id. When the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants is proper. United States v. Lane, 735 F.2d 799, 804 (5 Cir.1984), reversed on other grounds, United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions. United States v. Welch, 656 F.2d 1039, 1049 (5 Cir.1981). However, “[i]t is clear that defendants charged with two separate albeit similar conspiracies having one common participant are not, without more, properly joined.” Id. When the connection between different groups is limited to a few individuals common to each, but those individuals commit separate acts which involve them in separate offenses with no common aim, then the requisite substantial identity of facts or participants is not present. United States v. Nettles, 570 F.2d 547, 551 (5 Cir.1978). The issue of misjoinder under F.R.Cr.P. 8(b) is a matter of law. Id. Under federal law, review of a challenge to a joinder of defendants is by de novo review. See United States v. Holloway, 971 F.2d 675, 679 (11 Cir.1992). Generally, to determine whether joinder is sound in the federal system, a reviewing court must examine the face of the indictment. United States v. Andrews, 765 F.2d 1491, 1496 (11 Cir.1985). However, it has been held appropriate in some cases to consider the evidence adduced at trial as well as the allegations of the indictment. Id., citing United States v. Leach, 613 F.2d 1295 (5 Cir.1980) and United States v. Nettles, 570 F.2d 547 (5 Cir.1978). Accord State v. Hester, 99-426, p. 27 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 113 (court reviewing denial of motion to quash based on improper venue may consider evidence both from motion hearing and trial, analogizing the situation to review of denial of a motion to suppress, where it is well-settled that the court may consider the evidence adduced at trial).
In the twenty-eight count single bill of information filed by the State in the instant case, count one charged defendant and David Dominici with conspiracy to commit theft, count eight charged Aaron Jarabica, Warren Angelo and David Dom-inici with conspiracy to commit theft, and count ten charged Dr. Roy Boucvalt and Warren Angelo with conspiracy to commit theft. Carl Campo and Angelo were charged with one count of conspiracy to commit theft. Dominici, Campo and Jamie Donaldson were charged with seven counts of conspiracy to commit theft. Then there were the individual counts of theft and illegal possession of stolen things.
One of the few Louisiana cases to address misjoinder of defendants is State v. Walters, 440 So.2d 115 (La.1983), cited by defendant. In Walters, two female employees of a Bourbon Street establishment were charged in a single bill of information with obscenity. Two undercover police officers had entered the establishment together, purchased tokens, and were directed to separate booths where one defendant performed for the first officer, while the second defendant performed for the second officer. The facts of Walters, involving crimes committed by two defendants in a single establishment, on the same day at *722 virtually the same time, are so far removed from the facts in the instant case so as to make the case of no precedential value.
|41David Dominici said he first met defendant in 1997, but could not remember what month. Defendant said it was late 1997, indicating it was in November or December. The single conspiracy count as to defendant and Dominici alleged a period from November 1997 to March 1998. Carl Campo said he first met defendant in late 1997. Aaron Jarabica said he first bought from Dominici in March 1997. Mr. Jarabi-ca said he ran off Dominici the next time he came around to sell him something, but did not give a date. However, Mr. Jarabi-ca did state that defendant attempted to interest him in some goods a few more times after that, but he did not date these occasions. Dominici said Dr. Boucvalt was Warren Angelo’s customer, but that he had gone with Angelo when Angelo made some deliveries to Dr. Boucvalt.
Warren Angelo testified that he helped David Dominici and Carl Campo deliver some stolen urns to defendant sometime after February 18, 1998, but before he was arrested in connection with the instant case in April 1998. This was his only contact with defendant. He said he primarily sold to Mr. Jarabica and Dr. Boucvalt. Angelo said he aided Dominici only on a very few occasions. He claimed to have introduced Dominici to Mr. Jarabi-ca. Angelo said he first sold items to Dr. Boucvalt in late summer/early fall 1995, and to Mr. Jarabica in late summer 1996. He said he knew he stopped selling to Dr. Boucvalt in early 1997, because he was incarcerated from February 1997 to February 19, 1998. Angelo identified a check Mr. Jarabica wrote to him on February 10, 1997, right before Angelo went to jail.
Jamie Donaldson said she and Dominici sold to defendant and Aaron Jarabica. She testified that she once participated in the theft of some pots, and she, Dominici, Angelo and Dea Hartfield, her fellow exotic dancer who was Angelo’s | ^girlfriend, sold the pots to Aaron Jarabica. This apparently was her sole connection to Mr. Jarabica. She said Angelo sold to Dr. Boucvalt.
Carl Campo testified that he assisted Angelo and Dominici in stealing cemetery artifacts. He recalled delivering some urns to defendant with Dominici and Angelo. Campo first met defendant in late 1997, and also “knew” Mr. Jarabica and Dr. Boucvalt from selling cemetery artifacts. Campo indicated he had seen each of them numerous times. He also claimed that he, Dominici, Jamie Donaldson and Angelo had visited Mr. Jarabica’s store.
Dea Hartfield testified that she knew Dominici, Jamie Donaldson and Warren Angelo, her one time boyfriend. She did not know Carl Campo. At trial Ms. Hart-field recognized only Aaron Jarabica, someone to whom she and Angelo sold things. She said she last saw Angelo three years previously, when she moved home to Alabama after dropping him off at jail. This would have been in February 1997.
The evidence indicates that the sales by any of the thieves to Aaron Jarabica and Roy Boucvalt ended prior to any sales being made to defendant. Only Dominici and Angelo ever sold anything to Dr. Boucvalt. According to Jamie Donaldson, on at least one occasion, all four, Dominici, Donaldson, Angelo and Campo, participated in one way or another in a sale to Mr. Jarabica. All four, at one time or another, participated in sales to defendant.
As for defendant, Aaron Jarabica and Dr. Roy Boucvalt, there is no evidence any one of them was aware that the other was buying goods from any of the thieves. None of them were charged together in a *723 single count. They were just three of many throughout the city of New Orleans to whom the thieves sold their goods.
|4Jn United States v. Nettles, supra, a number of defendants were charged with six counts related to gambling offenses. Three police officers who had allegedly accepted payoffs were charged in all six counts. Defendants Robinson, Nettles and Saig were charged, respectively, in counts one, two and three with conducting separate illegal gambling businesses from May 6, 1973 through September 8, 1973. Robinson, Nettles and Saig were also charged, respectively, in counts four, five and six with separate conspiracies to obstruct law enforcement with the intent to facilitate the three separate gambling businesses. Defendants Robinson, Nettles and Saig proceeded to trial with two of the three corrupt police officers. Robinson and Nettles were convicted on their respective counts, one and four, and two and five, and appealed, claiming they had been improperly joined as defendants. The court found that the defendants in all six counts had been improperly joined. The court stated:
In this case, Counts One, Two and Three should not have been charged in a single indictment. The requisite identity of facts or participants necessary for proper joinder is not present. Each count alleges the existence of a gambling enterprise with their sole connection being the presence of Claxton, Barrow and Olson. [FN6] Each of these substantive counts arose from a different set of facts. The three policemen were included in the indictment in each of the substantive counts because they allegedly facilitated the conduct of the three different gambling enterprises. The policemen aided the operation by causing police raids to be made upon competing gambling operations and by contributing to the bonds and attorneys’ fees for bettors arrested in protected operations when raids could not be avoided. However, the benefits derived by each operation were from different actions by the indicted officers. The three police officers were also included in these three counts in hopes of meeting the federal statutory requirement of five persons to make an illegal gambling operation, (footnote omitted).
To suggest that because defendants were charged under the same statute they should be joined is ludicrous and does not merit discussion.
When, as here, the connection between different groups is limited to a few individuals common to each but those individuals commit separate acts which involve them in separate offenses with no common aim, then the requisite substantial identity of facts or participants is not present. Therefore, we find Counts One, Two, and Three could not properly be joined under Rule 8(b).
With respect to Counts Four, Five and Six, we reach the same result. The indictment charged three separate conspiracies to obstruct state or local law enforcement with the intent to facilitate three separate illegal gambling businesses. If the evidence showed one large conspiracy with the three police officers as the hub, each of the three gambling businesses operated by Nettles, Robinson and Saig as the spokes, and some interaction between the opera *724 tions to provide the rim, then the defendants could have been so indicted. However, “(f)or a wheel conspiracy to exist those people who form the wheel’s spokes must have been aware and must do something in furtherance of some single, illegal enterprise”. United States v. Levine, 546 F.2d 658, 663 (5th Cir.1977). If not, there is no rim to enclose the spokes. United States v. Levine, 546 F.2d at 663. The absence of a rim was apparently noted when the indictment was drawn charging three separate conspiracies.
A careful review of the facts and the record shows these conspiracies, although similar, were not a “series” under Rule 8(b). There was no substantial identity of acts or participants between these alleged conspiracies. The involvement of the same police officers in each count does not provide the necessary relationship required by Rule 8(b). See United States v. Marionneaux, 514 F.2d 1244 (5th Cir.1975), where defendants in parallel conspiracies with the same purpose |4Fiand a mutual defendant were found to be improperly joined. Combining these three counts in one indictment contravenes Rule 8(b)’s requirements for proper joinder.
Combining in one indictment the three substantive counts with the three conspiracy counts does not remedy the mis-joinder. Where a substantive count is within the scope of a conspiracy charged then their joinder is proper. See United States v. Gentile, 495 F.2d 626, 632 (5th Cir.1974). That is the situation as to Counts One and Four, Counts Two and Five, and Counts Three and Six. However, there is no overlapping which would allow each of these three groups to then be joined under Rule 8(b).
570 F.2d at 551-552.
The facts of the instant case are similar to those in Nettles. Indeed, Nettles presented a stronger case for joinder of its aggrieved defendants than the instant case does for joinder of defendants, Aaron Jara-bica and Dr. Roy Boucvalt, because in Nettles the same three police officers were common to all six of the counts. In the instant case there are no defendants common to all counts, and no defendants common to the three respective conspiracy counts against defendant, Mr. Jarabica and Dr. Boucvalt. Further, in Nettles, the charges were all limited to the same time period. In the instant case, evidence indicates that the sales by the thieves to Aaron Jarabica and Dr. Roy Boucvalt all occurred prior to any sales being made to defendant. Accordingly, the joinder of defendant’s counts with the counts of his two codefendants was an improper joinder of defendants.
However, misjoinder is subject to the harmless error rule. See United States v. Lane, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). An error is harmless if the guilty verdicts rendered in this case were surely unattributable to the error. State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845. In determining whether the misjoinder was harmless, a court may consider the effect 14fiof a limiting instruction charging the jury to consider the guilt or innocence of each defendant individually. U.S. v. Pigee, 197 F.3d 879, 891 (7th Cir.1999).
Defendant avers that prejudice to him due to the misjoinder is manifest. He submits that although the trial court gave a limiting jury instruction that the jury was to consider the evidence and/or lack of evidence as to each defendant and each count individually, that instruction was “overwhelmed” by the State’s effort to lump all the defendants together. The record is replete with examples *725 of the State’s lumping of the three defendants together. The case was an extremely high-profile one, in large part because it involved the three defendants instead of just Peter Patout. The case was complex because it involved three defendants charged with in a twenty-eight-count indictment with different offenses and conspiracies committed over a period of almost three years. Defendant’s involvement spanned a period of at most, six months, and only seven of the twenty-eight counts in the indictment related to defendant.
With the three defendants, there was a danger that the jury would compare degrees of culpability. In particular, Aaron Jarabica’s defense entailed the presentation of considerable evidence showing the steps Mr. Jarabica took to insure that he purchased only legitimate goods from sellers who came into his store off the street. Witnesses testifying on his behalf repeatedly told how Mr. Jarabica recorded the sellers’ personal identification information and retained that information in his business records. Defendant’s purchasing procedures, by comparison, appeared to be almost grossly negligent, perhaps explaining why Mr. Jarabica was acquitted on all counts against him, while defendant was convicted on three of the seven counts against him.
147Pefendant cites as evidence of prejudice the jury’s acquittal of him as to a charge of illegal possession of the statue of Our Lady of Prompt Succor, his last purchase, while it convicted him with regard to two statues purchased earlier, the Lady with a Cross and the Lady with a Wreath. Defendant submits that this discrepancy is due to confusion caused by the misjoinder. The jury verdicts with respect to defendant’s possession of the Lady with a Wreath and Our Lady of Prompt Succor are irreconcilable under the facts of this case. Defendant was in possession of both of these statues on April 14, 1998 when he accompanied police to his home, and had purchased Our Lady of Prompt Succor after he purchased the Lady with a Wreath. He was charged in separate counts with illegal possession of both statues on April 14, 1998. It cannot be ruled out that the guilty verdict as to the count of illegal possession of the statue of the Lady with a Wreath was attributable to jury confusion caused by the misjoinder.
The State improperly joined defendant Peter Patout, Dr. Roy Boucvalt and Aaron Jarabica. The trial court erred in failing to either grant defendant’s motion to quash the indictment on the grounds of improper joinder of parties or to grant defendant’s motion to sever defendants. The trial court also erred in subsequently denying defendant’s motion for a new trial based on its failure to quash the indictment or grant the severance. It cannot be said that the jury verdicts rendered in this ease against defendant were “surely unattributable” to the misjoinder and the trial court errors in denying defendant’s motion to quash and/or the motion to sever. Accordingly, the errors were not harmless, and defendant’s convictions and sentences must be reversed for this reason alone.
There is merit to this assignment of error.

\ ¿ASSIGNMENTS OF ERROR NO. 4, 5 AND 6:

We pretermit discussion of these assignments as they have become moot as a result of our disposition of assignments one, two and three.

CONCLUSION:

For the above and foregoing reasons the defendant’s convictions are reversed and the sentences imposed by the trial court ar,e vacated. The matter is remanded to *726 the trial court for further proceedings consistent with this opinion.
CONVICTIONS REVERSED; SENTENCES VACATED; REMANDED.

. The two remaining co-defendants tried with defendant, Dr. Roy Boucvalt and Aaron Jara-bica, were acquitted.

. State v. Patout, unpub., 2000-1988 (La.App. 4 Cir. 9/12/00), writ denied, 2000-2629 (La.9/15/00), 767 So.2d 707.

. We note the inconsistency in the testimony that the witness had a lunch engagement with defendant in January of 1998, before she first met him in the fall of 1998, October or November according to her testimony. However that is the testimony as recorded in the transcript. See Transcript, Vol 10 of 11 pp. 203-205. Perhaps the witness simply misspoke the year or perhaps there is a typographical error in the transcription. The trial exhibits were not included with the record on appeal so we are unable to view the calendar introduced by the defendant in conjunction with Ms. Lovelly’s testimony to clear up this apparent inconsistency. This discrepancy does not *714 affect our resolution of the merits of the appeal.

FN6. The suggestion that because the operations existed during the same time period and each group of defendants were charged under the same statute then the requirements of Rule 8(b) were met is without merit. The time periods are the same because evidence of the operations began when the police investigation began and ended when the defendants ivere arrested.